**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**HERITAGE FOUNDATION,** *et al.*,

    **Plaintiffs,**

      v.

**U.S. DEPARTMENT OF JUSTICE,**

    **Defendant.**

                             Civil Action No.  23-1148 (JEB)

---

<u>**MEMORANDUM OPINION**</u>

Plaintiff Heritage Foundation is a public-policy organization based here in the District whose avowed mission is to promote "free enterprise, limited government, individual freedom, traditional American values, and a strong national defense."  ECF No. 5 (Am. Compl.), ¶ 4 (citation omitted).  Plaintiff Mike Howell is the head of its Oversight Project, an initiative seeking to "inform the public and Congress for the purposes of Congressional oversight" through Freedom of Information Act requests and other means.  <u>Id.</u>, ¶ 5.  True to their credo, Plaintiffs filed a FOIA request with the Federal Bureau of Investigation seeking various communications regarding Timothy Thibault, a former Assistant Special Agent in Charge of the FBI's Washington Field Office, who has (whether fairly or not) come under congressional and media scrutiny over allegations of partisan bias and other misconduct.

The FBI, to date, has produced nothing — refusing to confirm or deny that certain categories of responsive records exist and categorically withholding others on the ground that they would invade Thibault's and another third party's privacy interests.  Such obduracy led to this FOIA lawsuit, and at this juncture, the parties have cross-moved for summary judgment.

Finding that they both raise some valid points, the Court will grant in part and deny in part both

Motions.

**I.     Background**

The following facts are undisputed.  On April 5, 2023, Howell submitted a FOIA request

to the FBI seeking the following records from January 1, 2015, onward:

> 1.  All communications containing the terms:
>       a.  "Missy" OR "Morgan" AND "Tim" OR "Timothy" AND "Thibault"
>       b.  "Missy" OR "Morgan" AND "whistleblower"
>       c.  "Thibault" AND "whistleblower"
>       d.  "Thibault" AND "Grassley"
>       e.  "@missymorganfit"
> 2.  All communications between Timothy Thibault and the news media.

ECF No. 9-3 at 5 (FOIA Request) at 1.  As background, the request letter expatiated on the

alleged scandal motivating these two "specifications" — to borrow Plaintiffs' parlance — and

the kinds of documents they were intended to capture.  Id. at 5–14; see Am. Compl., ¶ 22.  Their

impetus, put simply, was "widespread concerns raised from members of Congress and the news

media, that the former Assistant Special Agent in Charge (ASAC) at the FBI Washington Field

Office (WFO), Timothy Thibault, ha[d] engaged in partisan[] behavior in the exercise of his

duties."  FOIA Request at 5–6.

The FOIA request cited three letters from the former Ranking Member of the Senate

Judiciary Committee, Charles Grassley, to the Attorney General and FBI Director, expressing

alarm over Thibault's seemingly partisan activities on social media — including sharing or liking

posts and news articles that were critical of Republicans.  Id. at 6 n.9, 7 n.17, 9 n.26.  It also

outlined "troubling allegations" that Grassley had received from whistleblowers, who claimed

that Thibault opened investigations "in a manner appearing to benefit the political aims and

objectives of a select few Justice Department and FBI officials" based upon unverified and

biased media reports and that he improperly discredited negative information regarding Hunter Biden that could have been a predicate for further investigation.  Id. at 8–11.

The request letter additionally referenced "news reports" that Thibault may have been "a source to news media outlets seeking to out and discredit whistleblowers who have raised concerns about the weaponization of government and law enforcement for political purposes." Id. at 12.  It also cited one report purporting to have discovered "the social media accounts of ASAC Thibault's alleged girlfriend" — a woman named Melissa Morgan-Ransome — who "reportedly made a number of social media posts that appear to be informed by her alleged relationship with Mr. Thibault and forecast an apparent scheme to potentially out and discredit whistleblowers who have made protected disclosures to Congress."  Id.  This apparently included tweets in February and March 2023, in which she stated that Grassley's whistleblowers were "lying," that they "aren't as anonymous" as believed, and that the "truth will soon be revealed." Id. at 13.

As used in Plaintiffs' FOIA queries, then, the terms "Missy," "Morgan," and "@missymorganfit" refer to Morgan-Ransome; the terms "Tim," "Timothy," and "Thibault" refer to ASAC Thibault; and the term "Grassley" refers to Senator Grassley.  See ECF No. 9-2 (Declaration of Michael G. Seidel) at 4 n.3.  They are designed to capture "communications from a senior FBI official [i.e., Thibault] at the center of credible allegations that significantly question the integrity of the FBI," and that Plaintiffs suppose would help the public determine "whether the FBI's administration of justice is unbiased."  FOIA Request at 19.

The FBI assigned separate FOIA request numbers to Plaintiffs' two specifications and acknowledged receipt of both by letters dated April 18, 2023.  See Seidel Decl., ¶¶ 7, 10.  Three days later, it denied each one by issuing what is known as a Glomar response, refusing to

confirm or deny that any responsive records exist because such acknowledgment "could reasonably be expected to constitute an unwarranted invasion of personal privacy" under FOIA Exemptions 6 and 7(C).  Id., ¶¶ 8, 11; see also 5 U.S.C. § 552(b)(6), 7(C).

Dissatisfied with that answer, Plaintiffs filed the present lawsuit while also administratively appealing the denial to DOJ's Office of Information Policy the following week. See Seidel Decl., ¶¶ 12, 17.  In doing the latter, they clarified that they hoped to uncover evidence that Thibault had made unauthorized leaks to the media to retaliate against the aforementioned whistleblowers and to uncover how Morgan-Ransome had "obtain[ed] knowledge about the identities of FBI whistleblowers and the contents of their legally protected disclosures," as they believe her tweets imply.  See ECF No. 9-3 at 40 (Appeal Ltr.) at 43.

On May 25, OIP affirmed the FBI's response to Specification 1 on partially modified grounds.  See Seidel Decl., ¶ 15.  It found that the Glomar response was appropriate as to Subparts A, B, C, and E, but not Subpart D.  Id.  Although it believed that acknowledging the existence of documents containing the words "Thibault" and "Grassley" would not constitute an "unwarranted invasion of personal privacy," OIP concluded that disclosing any such documents would.  Id.  Therefore, the records sought by Subpart D could be categorically withheld under the same two FOIA exemptions.  Id.  As to the second request (which sought communications between Thibault and news media), OIP upheld the Glomar response in full.  Id., ¶ 16.  To date, the FBI has not conducted any search in response to Plaintiffs' queries.  See ECF No. 18 (Def. Opp. & Reply) at 25.  Both parties now move for summary judgment.

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Off. of the U.S. Trade Representative, 641 F.3d 521, 527 (D.C. Cir. 2011).  In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).  Such affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'"  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).  "FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

### III.   Analysis

Under FOIA, "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules[,] . . . shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  If the records fall into one of nine statutorily created exemptions, however, the Government need not turn over the requested information.  Id. § 552(b)(1)–(9).  To show that an exemption applies and justifies the withholding of records, the Government "must provide a 'relatively detailed justification'" for its withholding, "specifically identifying the reasons why [the] exemption is relevant."  Morley v. CIA, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (quoting King v. DOJ, 830 F.2d 210, 219 (D.C. Cir. 1987).  This Court can compel the release of records that do not fall within at least one exemption.  See Reps. Comm. For Freedom of Press, 489 U.S. at 755.

The agency need not always justify its withholdings on a document-by-document basis.  "[I]t may instead do so category-of-document by category-of-document, so long as its definitions of relevant categories are sufficiently distinct to allow a court to determine whether the specific claimed exemptions are properly applied."  Citizens for Resp. & Ethics in Wash. v. DOJ, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (CREW).  Such treatment is appropriate "only when the range of circumstances included in the category characteristically supports an inference that the statutory requirements for exemption are satisfied."  Id. at 1088–89 (cleaned up); accord Reporters Comm. For Freedom of Press, 489 U.S. at 776.  If all requested records would be categorically exempt from disclosure, the agency need not conduct a search.  See Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011); Black v. DOJ, 69 F. Supp. 3d 26, 40–41 (D.D.C. 2014).

Additionally, in the "rare situation when either confirming or denying the very existence of records responsive to a request would cause harm cognizable under an FOIA exception," the

agency may issue a <u>Glomar</u> response.  <u>Bartko v. DOJ</u>, 898 F.3d 51, 63 (D.C. Cir. 2018) (cleaned up).  "The question in [such a] case is whether disclosing even the existence or nonexistence of the requested records is itself information protected by" the relevant exemption.  <u>Id.</u> at 64 (cleaned up); <u>see also</u> <u>People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, Dep't of Health & Hum. Servs.</u> (<u>PETA</u>), 745 F.3d 535, 540 (D.C. Cir. 2014) ("[T]o the extent the circumstances justify a <u>Glomar</u> response, the agency need not conduct any search for responsive documents.").

The FBI invoked FOIA Exemptions 6 and 7(C) in rebuffing Plaintiffs' demands and now seeks summary judgment under either.  Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Its application is not limited to "a narrow class of files containing only a discrete kind of personal information[,]" but was "intended to cover detailed Government records on an individual which can be identified as applying to that individual."  <u>U.S. Dep't of State v. Wash. Post Co.</u>, 456 U.S. 595, 602 (1982).  Consequently, its "protection not only relates to entire physical files, but also encompasses bits of personal information that refer to a particular individual, including such items as a person's name."  <u>Willis v. Fed. Bureau of Investigation</u>, 2019 WL 2138036, at *7 (D.D.C. May 16, 2019) (cleaned up).  Exemption 7(C), conversely, excludes from disclosure "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  <u>Id.</u> § 552(b)(7)(C).

Both provisions require agencies and reviewing courts to "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested

information." Beck v. DOJ, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (quoting Davis v. DOJ, 968 F.2d 1276, 1281 (D.C. Cir. 1992)).  That balance, however, tilts more strongly toward nondisclosure in the context of Exemption 7(C) because "Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6." Reporters Comm., 489 U.S. at 756.

While the parties vigorously contest whether all responsive documents would meet Exemption 7(C)'s threshold law-enforcement requirement, they do not appear to dispute that they would otherwise meet Exemption 6's requirement for "personnel," "medical," or other "similar" files insofar as they reference Thibault or Morgan-Ransome.  See ECF No. 15-1 (Pl. MSJ) at 14–15 (taking issue with Government's showing on Exemption 6 solely as to balance of interests); see also Downs L. Grp., P.A. v. U.S. Coast Guard, 2023 WL 4744044, at *9 (D.D.C. July 25, 2023) ("[T]he threshold for determining whether information applies to a particular individual [under Exemption 6] is minimal.") (citation omitted).

The Court, accordingly, begins with the question of whether any responsive documents would necessarily constitute law-enforcement records so as to trigger Exemption 7(C)'s lower withholding threshold.  See Nova Oculus Partners, LLC v. U.S. SEC, 486 F. Supp. 3d 280, 288 (D.D.C. 2020) ("When an agency invokes both exemptions, courts 'focus' on Exemption 7(C) because it 'establishes a lower bar for withholding material.'") (quoting CREW, 746 F.3d at 1091 n.2).  Finding that some conceivably might not (even though others certainly would), it then considers whether the balance of public and private interests would satisfy the requirements of each exemption.

A. <u>Law-Enforcement Records</u>

       *1. Legal Standard*

Only records that were compiled for "law enforcement purposes" are shielded from

disclosure under Exemption 7(C).  <u>See</u> <u>Jefferson v. Dep't of Justice</u>, 284 F.3d 172, 176–77 (D.C.

Cir. 2002).  The D.C. Circuit has set forth a two-part test for determining when this requirement

is met.  First, "the investigatory activity that gave rise to the documents [must be] 'related to the

enforcement of federal laws.'"  <u>Id.</u> at 177 (quoting <u>Pratt v. Webster</u>, 673 F.2d 408, 420, 421

(D.C. Cir. 1982)).  Second, there must be "a rational nexus between the investigation at issue and

the agency's law enforcement duties."  <u>Id.</u>  The requirement encompasses not just criminal

investigations but also "civil investigations and proceedings in its scope."  <u>Mittleman v. Off. of</u>

<u>Pers. Mgmt.</u>, 76 F.3d 1240, 1243 (D.C. Cir. 1996).  Importantly, the exemption applies

regardless of whether the records were originally <u>created</u> for a law-enforcement purpose — so

long as they were <u>compiled</u> for such a purpose when the Government invoked the exemption.

<u>See</u> <u>John Doe Agency v. John Doe Corp.</u>, 493 U.S. 146, 153 (1989) (concluding that

correspondence between defense contractor and Defense Contract Audit Agency was protected

by Exemption 7 because it was subpoenaed seven years later in connection with grand-jury

investigation into contractor's potentially fraudulent practices).

       "Courts generally afford some deference to agencies specializing in law enforcement that

claim their records are eligible for Exemption 7(C) protection" — including the FBI.  <u>Lindsey v.</u>

<u>FBI</u>, 490 F. Supp. 3d 1, 17 (D.D.C. 2020) (cleaned up).  That deferential standard of review,

however, is not "vacuous."  <u>Campbell v. DOJ</u>, 164 F.3d 20, 32 (D.C. Cir. 1998), <u>as amended</u>

(Mar. 3, 1999).  Unless the declaration offered in support of the exemption supplies "facts in

sufficient detail to apply the <u>Pratt</u> rational nexus test," the Court cannot grant summary judgment for the agency on that basis.  <u>Id.</u>

Further, "FBI records are not law enforcement records simply by virtue of the function that the FBI serves."  <u>Vymetalik v. FBI</u>, 785 F.2d 1090, 1095 (D.C. Cir. 1986).  And not every investigation into an FBI (or other agency) employee's alleged misconduct will necessarily satisfy the <u>Pratt</u> rational-nexus test.  "Internal agency investigations," for example, in which the agency, "acting as the employer, simply supervises its own employees," will typically fall outside the ambit of Exemption 7(C), even though such monitoring "might reveal evidence that later could give rise to a law enforcement investigation."  <u>Kimberlin v. DOJ</u>, 139 F.3d 944, 947 (D.C. Cir. 1998) (cleaned up).  The key question in determining whether the investigation falls into the law-enforcement or internal-monitoring bucket is "how and under what circumstances the requested files were compiled."  <u>Jefferson</u>, 284 F.3d at 176–77.  "[A]n agency's investigation of its own employees is for 'law enforcement purposes' if it focuses directly on specifically alleged illegal acts, illegal acts of particular identified officials, [or] acts which could, if proved, result in civil or criminal sanctions."  <u>Kimberlin</u>, 139 F.3d at 947 (cleaned up).

### 2. Application

In reliance on the accompanying declaration of the FBI's Section Chief of the Record/Information Dissemination Section, Michael Seidel, DOJ here asserts that Exemption 7 applies because any records responsive to Plaintiffs' two specifications "would have been created and maintained during the performance of a non-Senior Executive Service (SES) FBI employee's official duties and likely would pertain to the oversight of investigative matters under the employee's purview."  ECF No. 9 (Def. MSJ) at 10 (quoting Seidel Decl., ¶ 19).  To the extent that any responsive records were not "created initially as part of an investigatory

function," Defendant adds, "those would still be records compiled subsequently for law enforcement purposes because they would be part of an investigation into" the illegal political bias alleged in the FOIA request.  Id.; see also ECF No. 18-1 (Supplemental Declaration of Michael G. Seidel), ¶ 9 ("Internal investigations are conducted by FBI Special Agents and any misconduct investigated could potentially constitute illegal acts that may be punishable by criminal or civil sanctions.").

According to Plaintiffs, however, this assumes — without warrant — that the only possible responsive records are those that show Thibault doing his job (i.e., with respect to law-enforcement investigations targeting others) or show the FBI investigating Thibault himself for illegal conduct.  They maintain, however, that "the call of the Request . . . sweeps much more broadly and clearly brings in administrative records" that were not created (and would not subsequently be compiled) as part of any particular investigation into illegal misconduct.  See ECF No. 23 (Pl. Reply) at 6 (proposing as examples an "internal best practices document for media responses to whistleblower allegations" that references Thibault's experience or a conversational email from one FBI agent to another, stating, "It's messed up Tim is leaking to [Morgan-Ransome] to attack whistleblowers"); Pl. MSJ at 11.

They have a point.  With regard to Specification 1, it is not apparent why no records could possibly exist that were compiled for an administrative purpose or that pertain exclusively to an internal, disciplinary matter and yet contain the requested search terms.  Plaintiffs, to be sure, fashioned those terms primarily to capture records related to the specific misconduct set forth in the background section of their FOIA request letter — which they insinuate may constitute violations of federal law.  See FOIA Request at 7 (alleging that Thibault's counsel "confirmed that his social media posts potentially violated the Hatch Act"); Pl. MSJ at 1

("Plaintiffs' FOIA Request . . . seeks to learn more about" the "allegations that ASAC Thibault has engaged in considerable misconduct" and "enlisted his romantic partner . . . in this misconduct."); ECF No. 9-3 at 43 (Appeal Ltr.) (Specification 1 seeks "to understand the scope of potential whistleblower retaliation within the FBI" and how "the purported girlfriend of [Thibault] . . . obtain[ed] knowledge about the identities of FBI whistleblowers and the contents of their legally protected disclosures," and Specification 2 seeks evidence of Thibault's "leaks to the media."). The Court also credits Seidel's averment that any records of an investigation into such misconduct (and any records reflecting misconduct that were collected in connection with such an investigation) would qualify as law-enforcement records. See Def. MSJ at 10.

The problem for Justice's position, however, is that Plaintiffs' request conceivably embraces records outside that category. If their internal-best-practices and FBI-email hypotheticals are any indication, Plaintiffs are holding out hope that some documents compiled for an administrative purpose may nevertheless contain stray references to Thibault's alleged misconduct. They also imagine that their proposed Boolean searches might capture evidence of impropriety falling beneath the threshold for a violation of law or agency policy that the FBI would investigate, see Pl. Reply at 8, unlawful conduct by Thibault that the Agency simply chose not to investigate, or casual email exchanges reflecting on Senator Grassley's letters. See id. at 7; Pl. MSJ at 12–13, 31; see also United for FBI Integrity v. DOJ, 2024 WL 961001, at *8 & n.4 (D.D.C. Mar. 6, 2024) (rejecting sweeping Glomar response under Exemption 7(C) where "broad language of Plaintiff's requests would cover records about complaints and investigations into conduct that would not necessarily lead to civil or legal sanctions"); PETA, 745 F.3d at 544 (Exemption 7(C) would not extend to "documents showing that the agency had received complaints about [third parties] that it elected not to investigate.").

Absent further elaboration in either of Seidel's declarations as to why such records could not exist — even accounting for the special deference to which the FBI is entitled as a law-enforcement agency — the Court simply cannot assume that all documents responsive to Specification 1 would necessarily constitute law-enforcement records. See Nation Mag., Wash. Bureau v. U.S. Customs Serv., 71 F.3d 885, 890 (D.C. Cir. 1995) ("[A]n agency . . . has a duty to construe a FOIA request liberally."); see also, e.g., Prop. of People v. DOJ, 310 F. Supp. 3d 57, 66 (D.D.C. 2018) ("[A] liberal construction of '[a]ny and all records' related to Donald Trump would include both investigative and non-investigative files.").

Specification 2 likewise sweeps more broadly than the Government thinks. Seidel explains that, under FBI policy, except for the head of a Field Office (which would be the Assistant Director in Charge or Special Agent in Charge) or a Public Affairs Officer she has designated, all FBI personnel are prohibited from "communicat[ing] with the media on behalf of the FBI or regarding FBI matters" absent explicit authorization. See Suppl. Seidel Decl., ¶ 6 & n.1. Therefore, he infers, any potential communications between Thibault and the news media "would have been created in the course of ASAC Thibault's law enforcement duties," thus rendering them law-enforcement records. Id., ¶ 6. An unstated premise of this syllogism, however, is that Thibault would have been explicitly authorized to communicate with the media only for a law-enforcement purpose within the meaning of the Pratt test. Absent supporting detail, the Court cannot assume that the premise is true.

This is all to say that the universe of documents that would be responsive to each part of the FOIA request potentially encompasses both law-enforcement and non-law-enforcement records. It remains to be seen whether the balance of public and private interests in confirming whether the former exist satisfies Exemption 7(C)'s requirement for withholding records, and

whether such balance regarding the latter meets Exemption 6's more disclosure-friendly standard.  To those issues, the Court now turns.

B.  Balance of Public and Private Interests

The Court first addresses the balance of interests implicated by the parts of the FOIA request that ultimately received a Glomar response.  As to each part, the question is whether confirming the existence of responsive records would constitute a clearly unwarranted invasion of personal privacy under Exemption 6, and, if not, whether such acknowledgment with respect to any responsive law-enforcement records meets Exemption 7(C)'s less demanding threshold.  It then performs a similar examination as to the documents that were categorically withheld.  But first, a brief exposition of how the balance-of-interests analysis must be conducted.

1.  Legal Standard

Under either exemption, the Government must identify a privacy interest at stake.  The party seeking disclosure must then demonstrate a "public interest in the information that is sufficient to overcome the privacy interest at issue."  Boyd v. Crim. Div. of U.S. Dep't of Just., 475 F.3d 381, 386–87 (D.C. Cir. 2007).  More specifically, the "FOIA requester must (1) 'show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and (2) 'show the information is likely to advance that interest.'"  Id. at 387 (quoting Nat'l Archives & Recs. Admin. v. Favish, 541 U.S. 157, 172 (2004)).  Further, "[i]f the public interest is [in exposing] government wrongdoing, then the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."  Id. (cleaned up).

In Glomar cases, Exemptions 6 and 7(C) allow agencies to conceal the existence of responsive documents if the presence of such records in the agency's system would "associate

14

the individual named in the request with criminal activity" or otherwise compromise the person's privacy.  Nation Mag., 71 F.3d at 893.  The burdens on the agency and requester are otherwise the same.  See Bartko, 898 F.3d at 64 (agency asserting Glomar "bore the burden of making an across-the-board showing that the privacy interest the government asserts categorically outweighs any public interest in disclosure").

On this much the parties agree.  There is, however, some dispute as to whether the public-interest portion of the analysis in Glomar cases is confined to the benefits of acknowledging the existence or non-existence of responsive records — as DOJ contends — or whether it includes the potential contents of such records.  Compare Def. MSJ at 17 with Pl. MSJ at 19–21.  The Court need not venture far beyond DOJ's own pleadings to see that the latter approach is the right one.  Justice, elsewhere, trumpets the rule that an asserted public interest in uncovering government misconduct that the withheld documents might expose must be supported by sufficient evidence.  See Def. MSJ at 16–17.  As such a requirement pertains to the contents of possible responsive records (and not the bare fact that they exist), one would conclude, if DOJ's position were correct, that it has no relevance in Glomar cases.  But the opposite is true.  See, e.g., Jefferson, 284 F.3d at 179–80 (holding that, if responsive records consist of law-enforcement records, then Glomar was appropriate, given the absence of evidence "suffic[ient] to raise a claim of illegal agency activity"); Bartko, 898 F.3d at 67 (finding Glomar response inappropriate because, given well-substantiated pattern of discovery abuses in U.S. Attorney's Office, public interest in some records might weigh more heavily than in others).

Even in Glomar cases where public interests other than revealing government misconduct are asserted, the D.C. Circuit and other courts in this district have considered how the possible contents of responsive records might weigh in favor of disclosure.  See PETA, 745 F.3d at 542–

43 (upholding <u>Glomar</u> but recognizing that "[r]esponsive documents might illuminate various aspects of NIH's operations, including how the agency decides whether to investigate complaints and how it conducts investigations"); <u>see also</u> <u>Codrea v. Bureau of Alcohol, Tobacco, Firearms & Explosives</u>, 2022 WL 4182189, at *9 (D.D.C. Sept. 13, 2022) (upholding <u>Glomar</u> response, but recognizing that "the public has an interest in knowing how ATF handled the 2018 handgun incident, including whether (and with what diligence) it investigated Hunter Biden").

This approach, in any event, makes logical sense. The public may have an interest in confirming whether responsive records exist precisely because of the information such records might contain. This Court (like plenty of others before it) will therefore consider both.

### 2.   The Glomar Responses

Recall that OIP upheld the FBI's <u>Glomar</u> response as to all of Plaintiffs' FOIA request except Subpart D of Specification 1. The remaining parts can be divided for ease of analysis into two groups: those that reference Morgan-Ransome (Specification 1, Subparts A, B, and E) and those that reference only Thibault (Specification 1, Subpart C and Specification 2). As the interests at stake differ between them, the Court considers each group in turn.

### a.   Subparts Referencing Morgan-Ransome

The Government has identified multiple privacy interests of Morgan-Ransome's that are implicated here. First, as a third party not employed with the FBI, "mere confirmation" that her name appears in the agency's law-enforcement records could "engender comment and speculation and carries a stigmatizing connotation." Def. MSJ at 11 (citing <u>Schrecker v. DOJ</u>, 349 F.3d 657 (D.C. Cir. 2003)). Second, regardless of the nature of the records at issue, it could function as an acknowledgment by the FBI that a "connection" exists between her and Thibault — particularly in view of Plaintiffs' allegations and the public reporting on which they rely. <u>Id.</u>

at 12.  These are each valid and substantial privacy interests.  See, e.g., DOJ v. Reps. Comm. For Freedom of Press, 489 U.S. 749, 780 (1989) (holding "as a categorical matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy"); Prop. of People, 310 F. Supp. 3d at 68 ("When, as here, a FOIA request is made for FBI investigative records regarding a particular individual, the FBI's mere acknowledgment that it possesses responsive records associates the individual named in the request with suspected criminal activity.") (cleaned up).  Plaintiffs have offered no argument to the contrary.  See Pl. MSJ at 15–18 (focusing exclusively on Thibault's privacy interests); Pl. Reply at 9–11 (same).

Nor is there any countervailing public interest to tip the scales in favor of disclosure.  The sole public interest proposed in Plaintiffs' Cross-Motion is "in learning more about the 'highly credible' . . . whistleblower allegations against ASAC Thibault."  Pl. MSJ at 19.  The showing required for such a claim to register in the Court's analysis is not trivial.  As the Supreme Court held in National Archives & Records Administration v. Favish, 541 U.S. 157 (2004):

> [W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.

Id. at 174.  The Court noted that "clear evidence" is normally required to displace the presumption of legitimacy that courts accord to the conduct of government officials.  Id.  "Only when the FOIA requester has produced evidence sufficient to satisfy this standard will there exist a counterweight on the FOIA scale for the court to balance against the cognizable privacy interests in the requested records."  Id. at 174–75; see also SafeCard, 926 F.2d at 1205–06

("[U]nless there is compelling evidence that the agency denying the FOIA request is engaged in illegal activity, and access to the names of private individuals appearing in the agency's law enforcement files is necessary in order to confirm or refute that evidence, there is no reason to believe that the incremental public interest in such information would ever be significant.").

If the only public interest is in learning more about the whistleblower allegations relayed to Senator Grassley and summarized in the FOIA request, then, at least with respect to documents referencing Morgan-Ransome, there is no public interest to speak of. Plaintiffs have put forward no evidence that there are any whistleblower allegations concerning her. In fact, her name is altogether absent from the three letters from Grassley to DOJ and the FBI that form the bulk of the background section of the FOIA request letter. See FOIA Request at 6–11 (summarizing content of letters dated May 31, July 18, and July 25, 2022); ECF No. 5-1 at 23–26 (May 31 Ltr.), 27–30 (July 18 Ltr.), 31–34 (July 25 Ltr.). Plaintiffs' sole basis for pursuing records concerning her appears to be a single Substack article by a journalist purporting to have found "Timothy Thibault's girlfriend's Twitter account." ECF No. 5-2 at 9–18 (Article by Greg Price) at 1; see also FOIA Request at 12–13. The article gathers a series of tweets in which Morgan-Ransome accuses anti-Thibault whistleblowers of "lying" and admonishes his online critics that "facts" would imminently be made public. See Price Article at 6. It then speculates that Thibault might be "tweeting in defense of himself from her account" or "conspiring" with the FBI "to intimidate" the whistleblowers. Id. at 9.

These *non sequiturs* fall woefully short of the evidence necessary to establish a public interest based on government impropriety. See Beck, 997 F.2d at 1494 (though plaintiff need not "prove that a scandal exists," a "claim of public interest [must still] be based on the known facts"); cf. Jefferson, 284 F.3d at 180 (news clipping "stating that [agency] is inundated with

federal prisoner complaints" did not "suggest a predilection to ignore such complaints" and thus failed "to raise a claim of illegal agency activity").

Left with nothing against which to balance Morgan-Ransome's privacy interests, the Court finds that confirming that her name or her putative Twitter handle appears in FBI records (whether law-enforcement or not) would constitute a clearly unwarranted invasion of her personal privacy. See Nat'l Ass'n of Retired Fed. Emps. v. Horner, 879 F.2d 873, 879 (D.C. Cir. 1989) ("[S]omething, even a modest privacy interest, outweighs nothing every time."). The FBI's Glomar response as to Subparts A, B, and E of Specification 1 was therefore appropriate under Exemption 6 and also, necessarily, Exemption 7(C) (to the extent law-enforcement records are involved).

### b.   Subparts Referencing Just Thibault

The balancing of interests as to the parts of the FOIA request concerning Thibault alone — i.e., communications containing his name and the word "whistleblower" or communications between him and news media — is not nearly so simple.

### i.   Privacy Interest

On the privacy-interest front, Thibault has an interest similar to Morgan-Ransome's. See Def. MSJ at 11–12. He, too, would be affected by any implied confirmation that a connection exists between him and her. Additionally, confirming that Thibault's name appears anywhere in the FBI's records with the word "whistleblower" or that he has communicated with the news media would tend to associate him with the specific allegations of misconduct set out in the FOIA request. Id. at 12–13. This would "create[] [a] significant 'risk of subjecting that agent to undeserved embarrassment and attention.'" Id. at 13 (quoting Hunt v. FBI, 972 F.2d 286, 289 (9th Cir. 1992)).

Plaintiffs "concede" that these interests are "sufficient to trigger balancing." Pl. MSJ at 15. They point, however, to numerous factors that they believe diminish their weight in the analysis. The Court takes them up *seriatim*.

First, they maintain that his privacy interest is reduced by the fact that he held public office. Id. at 15–16. This is undoubtedly true. But his interest is not thereby erased completely. See CREW, 746 F.3d at 1092 (though public officials "may have a somewhat diminished privacy interest," they "do not surrender all rights to personal privacy") (cleaned up); accord Kimberlin, 139 F.3d at 949. His residual privacy interest remains strong to the extent that the existence of responsive records would lend credence to the whistleblowers' (and Plaintiffs') allegations that he abused his power or even suggest that the FBI received complaints about or investigated the matter. See Beck, 997 F.2d at 1494 ("A government employee has at least some privacy interest in his own employment records, an interest that extends to not having it known whether those records contain or do not contain information on wrongdoing, whether that information is favorable or not.") (cleaned up).

Second, Plaintiffs emphasize that Thibault was a "senior level supervisor who ran some of the most significant cases in the entire FBI and the subject of massive press attention," and he had a "role in supervising high level cases involving the former President, Donald J. Trump." Pl. MSJ at 16. This too reduces his privacy interest somewhat because in taking on "supervisory responsibility," Thibault accepted a role implicating "increased public interest in how [his field office's] policies and priorities were both set and implemented by [him] and the individuals under his direction." Bartko, 898 F.3d at 69. The Government parries this point by insisting that Thibault was a "non-SES" employee who did not head the field office in which he worked. See Def. Opp. & Reply at 11. The key issue, however, is his "supervisory responsibility," not his

title.  Bartko, 898 F.3d at 69.  The government official at the center of the FOIA request in

Bartko was an Assistant U.S. Attorney.  Id.  Although he led his Office's Economic Crimes

Section, he (like Thibault) was not its head.  Id.  Yet the Circuit counted his leadership

responsibility as a separate factor (independent of the publicity of his wrongdoing, contra Def.

Opp. & Reply at 11) militating against his claim to privacy.  This Court will follow suit —

bearing in mind, of course, that this factor might not apply to any records Plaintiffs seek

predating Thibault's promotion to the ASAC position in 2020.  See Def. Opp. & Reply at 11.

      Plaintiffs' third contention is that the allegations against Thibault "have been repeatedly

and publicly discussed as part of widely publicized Congressional oversight," such that

confirming that there are responsive records would have a marginal impact.  See Pl. MSJ at 17.

For this point they rely heavily on Judicial Watch, Inc. v. U.S. Department of Justice, 394 F.

Supp. 3d 111 (D.D.C. 2019).  The FOIA requester in that case had sought records regarding

former British intelligence operative Christopher Steele's contacts with the FBI, and the court

noted that Steele's privacy interests were diminished because of public reporting that had "thrust

[him] into the spotlight."  Id. at 118 ("It is hard for the Court to imagine that the disclosure of

any communications between him and the FBI . . . would occasion much greater public scrutiny

than he has already endured.").  The Court agrees that the same considerations exist here and

further diminish Thibault's privacy interest.  But, again, they do not extinguish it, as even the

Judicial Watch court recognized.  Id. (noting that Steele retained privacy interest in whether FBI

suspected him of "some wrongdoing").  Indeed, the Court is mindful that any government

employee can be dragged into the spotlight based on bad-faith (or just unfounded) accusations of

misconduct, and weighing this factor too heavily in the FOIA private-interest analysis may

generate perverse incentives.

The last of Plaintiffs' factors (contrary to the old expression) is the least persuasive. They point out that Thibault, through his lawyer, "publicly acknowledged" that his "social media posts are under the investigation of the Office of Special Counsel." Pl. MSJ at 18 (citing Seidel Decl., ¶ 27 n.6.). They also note that OSC has since "official[ly] acknowledge[d]" that investigation in a letter to Senator Grassley, and that the agency found that Thibault had violated the Hatch Act on July 21, 2020, when he retweeted a post by the Lincoln Project sharing an article from *The Atlantic* entitled "Donald Trump is a Broken Man." Pl. Reply at 2, 11; ECF No. 22-1 (OSC Ltr.).

This all may be true, but it is also not particularly relevant. OSC is not DOJ or the FBI. Neither Thibault nor the latter two agencies (from which Plaintiffs seek records) have acknowledged any investigation by them into his social-media posts, as occurred in cases where such public acknowledgement reduced a third party's privacy interest. See, e.g., Kimberlin, 139 F.3d at 947 (DOJ Office of Professional Responsibility withdrew Glomar response regarding records of OPR investigation into Assistant U.S. Attorney upon learning that AUSA had publicly acknowledged investigation); CREW, 746 F.3d at 1091–92 (congressman acknowledged he had been under investigation by DOJ, reducing potential for further stigma from confirming his name in FBI files). Nor has Thibault acknowledged an investigation by anyone into the myriad misconduct accusations leveled by the whistleblowers and presented by Plaintiffs as reasons for disclosure.

In short, Thibault's privacy interests survive but in weakened form.

### ii. Public Interest

The outlook for Plaintiffs' public-interest arguments is similarly mixed. As to Specification 2, which concerns Thibault's communications with news media, Plaintiffs' only

asserted public interest is in understanding "the manner in which the DOJ carries out substantive law enforcement policy," Pl. MSJ at 27 (citation omitted), which they imagine would be evident in the news-media communications of "a high-supervisory official." Id. at 28.  Beyond this generic statement, however, they have offered no representation about what they expect to see in Thibault's news-media communications (if any exist) that would be of specific interest to the public — as is typically necessary.  See CREW, 746 F.3d at 1093 ("[I]n addition to significant public interest, [a] requester must show the [requested] information is likely to advance that interest[.]") (cleaned up); see also id. (finding significant public interest was likely to be advanced because "the requested records [i.e., FD-302s and investigative materials] relate to a wide-ranging public corruption investigation as part of the FBI's ongoing efforts to root out systemic corruption within the highest levels of government") (cleaned up).  Such unelaborated curiosity resembles an interest in "having the information for its own sake," which is insufficient to trigger balancing.  See Boyd, 475 F.3d at 387 (citation omitted).

To the extent Plaintiffs mean to suggest that Thibault's news-media communications may evince misconduct, they have offered no evidence whatsoever to support that claim.  See FOIA Request at 12 (referencing, without elaboration, "news reports" that Thibault may have been a "source to news media outlets seeking to out and discredit whistleblowers").  Barring such evidence, the public interest is nil.  See Favish, 541 U.S. at 174–75.

The analysis as to Subpart C of Specification 1 — which sought records containing the terms "Thibault" and "whistleblower" — is a different kettle of fish.  Plaintiffs' asserted public interest here is (once again) in "learning more about the highly credible whistleblower allegations."  See Pl. MSJ at 19 (cleaned up).  So the analysis depends, once more, on what those allegations were and whether there is sufficient evidence to "warrant a belief by a reasonable

person" that they "might" be true.  <u>Favish</u>, 541 U.S. at 174.  In Senator Grassley's telling, whistleblowers described a pattern of partisan behavior in Thibault's (and, more generally, the FBI's) handling of "highly sensitive political corruption investigations and prosecutions."  FOIA Request at 7 (citation omitted); <u>see also</u> July 18 Ltr. at 1.  They claimed, for example, that he was "deeply involved" in the decision to pursue an investigation into the conduct of former President Donald Trump's campaign in 2020, which they say improperly relied on left-leaning news reports.  <u>See</u> July 18 Ltr. at 2.  They also accused Thibault, conversely, of "order[ing] closed" an avenue of investigation into "derogatory" information about Hunter Biden "without providing a valid reason."  <u>Id.</u> at 3.

In addition to these points from Grassley's 2022 letters to the DOJ, Plaintiffs' FOIA request cited a contemporaneous article from the *New York Post* that claims that Thibault "suppressed" "damning revelations" about Biden that he received from Biden's former business partner (whom the paper referred to as a "whistleblower").  <u>See</u> FOIA Request at 11–12; ECF Nos. 5-1 at 66–72 & 5-2 at 1–4 (*NY Post* Article).  Although it is not perfectly clear from Plaintiffs' briefing, the Court assumes that this business partner is among the whistleblowers whose allegations Plaintiffs believe the public has an interest in learning more about.

Plaintiffs, having no independent evidence to corroborate these misconduct allegations, rely entirely on the credibility of the sources reporting them.  As to the *Post* article, they have not bothered to explain why the Court should credit it.  As to the Grassley letters, on the other hand, they have submitted a declaration by the Chief Counsel of the Heritage Foundation's Oversight Project attesting (based on his prior experience as a staffer on a different committee) that Congressional Committee staff "must be careful" in vetting whistleblower complaints and "should, and oftentimes do," inform whistleblowers that lying to Congress is a felony.  <u>See</u> ECF

No. 19-1 (Declaration of  Kyle Brosnan), ¶¶ 8, 11.  It also highlights Grassley's "decades-long track record of advocating for, and working with whistleblowers, and conducting nonpartisan oversight," and offers the opinion that his staff likely "thoroughly vetted the whistleblower allegations his office received concerning ASAC Thibault."  Id., ¶ 18.

The Court is persuaded that the congressional whistleblowers' assertions (as relayed in Grassley's 2022 letters) are sufficient to warrant a belief by a reasonable person that misconduct might have occurred — but barely.  Despite Plaintiffs' urging, the Court does not regard Grassley's summary of those allegations as the "functional[] equivalent" of a sworn statement — in truth, they are hearsay.  See Pl. MSJ at 23.  Even taking that summary at face value, it is troublingly light on details necessary to assess whether Thibault did anything wrong.  E.g., July 18 Ltr. at 3 (accusing Thibault, in conclusory fashion, of having "no valid reason" for closing "investigative avenue" regarding Hunter Biden).  And Grassley's letter — issued on his own behalf — certainly does not carry the weight it might have had if it were issued by a bipartisan congressional committee.  See Def. Opp. & Reply at 17–18.

The Court, however, agrees with Plaintiffs that this case can be distinguished from Judicial Watch, Inc. v. U.S. Department of Justice, 898 F. Supp. 2d 93 (D.D.C. 2012).  There, in assessing the public interest supporting a FOIA request, the court declined to credit a member of Congress's "unelaborated assertion" that he was "reliably informed" that a decision not a prosecute an individual was "usurped" by high-ranking DOJ officials over "vehement" internal objections.  Id. at 105–06 (citation omitted).  It also highlighted that the congressman's statement was "directly contradicted" by other evidence in the plaintiff's own submissions.  Id. at 106.  The Court is unaware of any such contradiction here, and Plaintiffs have provided more elaboration as to how the whistleblower allegations came about.  See July 18 Ltr. at 1 (explaining that

Grassley received "significant number" of whistleblower communications in response to an earlier letter seeking them); July 25 Ltr. at 1 (same); Brosnan Decl., ¶ 12 (describing Grassley's storied whistleblower experience).  At least atmospherically, moreover, the claims of political bias (as wide-ranging and uncorroborated as they mostly are) find some concrete support in the OSC's recent conclusion that Thibault violated the Hatch Act by retweeting a post from a partisan organization, sharing a seemingly partisan article.  See OSC Ltr.

In short, Plaintiffs have crossed the finish line on the public-interest analysis with regard to Subpart C of Specification 1 — though their margin of victory is exiguous.

### iii. Balancing

To recap, Thibault retains a diminished privacy interest in confirming whether documents responsive to Specification 1, Subpart C and Specification 2 of the FOIA request exist.  There is, further, a meager public interest in the former but none at all in the latter.  The Court, consequently, finds that the FBI's Glomar response was appropriate as to Specification 2 under both Exemptions 6 and 7(C) to the extent that any responsive records are law-enforcement records.  As to Subpart C, the Court also concludes that Thibault's residual privacy interest outweighs the modest public interest but not by much.  Because that suffices to withhold information under Exemption 7(C) but not Exemption 6, the FBI's Glomar response was appropriate only to the extent that it covered law-enforcement records.

### 3.  The Categorical Withholdings

On to the final item, which can be dispensed with quickly.  Documents responsive to Subpart D of Specification 1 — that is, containing the terms "Thibault" and "Grassley" — were categorically withheld in full under Exemptions 6 and 7(C).  Plaintiffs have conceded that the FBI properly interpreted this subpart as seeking "records created in response to Senator

Grassley's letters."  Pl. MSJ at 28 (quoting Siedel Decl., ¶ 5 n.2).  Thibault's privacy interests

with respect to these records are the same as they were with respect to Subpart C and

Specification 2 — somewhat diminished but not eliminated.  The asserted public interest here,

however, is in "[u]nderstanding how the Department responds to high-profile Congressional

investigation by a Senator well known for investigative integrity and vigor."  Id. at 31.  If

Plaintiffs mean that the interest resides in how DOJ responds to high-profile congressional

investigations in general (regardless of what they are about), then the records at issue are a mere

data point.  That may be a cognizable interest, but its weight here is minimal.  If they mean,

instead, that the interest is in how DOJ responded to Grassley's investigation into Thibault, then

its weight ultimately depends on the alleged misconduct that was the subject of his inquiries.  It

is no more compelling, therefore, than the public interest in Subpart C — that is, extant but

relatively minimal.  The balance of interests either way is the same: Thibault's privacy interest

predominates slightly.  All responsive law-enforcement records were thus properly withheld

under Exemption 7(C), but responsive non-law-enforcement records were not.

No doubt, a substantial proportion (if not all) of the responsive records may well fall into

the former category.  Grassley's oversight letters are all framed as concerning "likely violations

of Federal laws, regulations and Federal Bureau of Investigation ('FBI') guidelines by [ASAC]

Timothy Thibault."  July 18 Ltr. at 1; July 25 Ltr. at 1; May 31 Ltr. at 1.  They go on to describe

purported instances of political bias in his handling of high-profile criminal investigations

(strongly implying that DOJ and the FBI should investigate the matter), and then demand

specific documents related to his and other agents' investigative work.  See May 31 Ltr. at 4

(requesting, for example, statistics "with respect to each investigation" Thibault supervised,

overseas travel records, and records of briefings); July 25 Ltr. at 3–4 (requesting, for example,

case files, leads received by field office).  The Court readily agrees that any records directly responding to them may continue to be withheld.  The categorical withholding was only improper as to any ancillary non-law-enforcement records that may have been generated in the course of the FBI's response and that contain the requested search terms.  Plaintiffs have expressed an interest in receiving them.  See Pl. MSJ at 31 (envisioning "search slip sheets," "decisions concerning the justification for withholding," and casual emails remarking on the senator's requests).

*     *     *

In summary, the FBI's Glomar response was properly issued, except as to non-law-enforcement records responsive to Subpart C of Specification 1.  Its categorical withholding of documents responsive to Subpart D was similarly justified except as to any responsive non-law-enforcement records.  The FBI must conduct a search for such files and either confirm their non-existence, withhold them in whole or in part based on any further FOIA exemptions, or disclose them.  Any further issues may be resolved on a subsequent motion for summary judgment.

## IV.   Conclusion

For these reasons, the Court will grant in part and deny in part both Defendant's Motion for Summary Judgment and Plaintiffs' Cross-Motion.  A separate Order consistent with this Opinion will issue this day.

/s/ James E. Boasberg

JAMES E. BOASBERG
Chief Judge

Date:  April 29, 2024